

The Law Office of Ryan Lozar, P.C.
305 Broadway, 14th Floor, New York, NY 10007
Tel: (310) 867-1562; Alternate Tel: (646) 666-8262; Fax 1-877-666-4456
ryanlozar@gmail.com

OCTOBER 16, 2018

Re:     Culbreath v. Griffin, et al., No. 17 Civ. 3406 (KMK) (LMS)

Dear Judge Smith:

    I represent Plaintiff Jeffrey Culbreath in the above-captioned Section 1983 case before the Court. Although Mr. Culbreath initially represented himself pro se, I recently made an appearance to represent him after pro bono appointment. See, e.g., Docket No. 2; Docket No. 56.

    As discussed at Sept. 21, 2018, conference with the Court, I write to request preauthorization for certain discovery costs including expert fees from the pro bono fund pursuant to the Amended Standing Order In the Matter of the Creation and Administration of the Pro Bono Fund, 16-MC-78 (hereinafter "Standing Order"). See Exh. 1 (copy of Standing Order). The Parties have another conference with the Court on Friday, Oct. 19, at 11:30 a.m.

    The funds will first finance necessary depositions. The Parties have scheduled two Defendants' depositions for October 26, 2018, in New York City, and we will shortly schedule the third. From my experience paying court-reporter invoices, I estimate that costs relating to these three proceedings may total somewhere in the range of $2,000 to no more than $3,000. (Alone this expense would not require me to make the instant application, as it falls well within the standard reimbursement range for a pro bono case.)

    Next, the requested monies will finance the expert services of Dr. Jonathan Borak, a board-certified physician in medicine and toxicology. In the event that the Parties can settle this case, I note that Dr. Borak's fee will be reimbursable to the Fund in accordance with the Standing Order at ¶ 6(c). (It is this expense category that requires the preauthorization application.)

    To describe the need for Dr. Borak's services in greater detail, a brief summary of relevant case facts is warranted. On August 3, 2015, Mr. Culbreath was in DOCCS custody at Green Haven Correctional Facility eating in the cafeteria when two inmates became involved in an altercation. Mr. Culbreath was not involved in the altercation in any way, and Mr. Culbreath was a significant distance away from it (by his estimate, 70 feet). When Defendant Officer Michael Nagy observed the altercation from a security booth, he indiscriminately dropped or launched cafeteria-wide chemical "bombs" (canisters loaded with the chemicals at issue) upon all inmates, including Mr. Culbreath.[1] As inmates began to manifest injury and pain from the chemical deployment (coughing, burning, difficulty breathing, etc.), Defendant Nagy unjustifiably and unreasonably deployed still more chemical canisters upon them en masse.

    The repeated chemical deployments uniquely affected Mr. Culbreath when the contents of a canister landed directly upon him. This in turn caused him particularly painful injury to his skin, eyes,

---

[1] I will omit specifics regarding these chemicals to defer to Defendants' security concerns as they have raised them at other points of this litigation. However, attorney's-eyes-only discovery has afforded me a preliminary understanding about their nature, and I will come prepared to discuss this at greater length with the Court at the Parties' October 19, 2018, conference.

respiratory system and more. In the cafeteria evacuation which followed the chemical force, which evacuation was proximately caused by Nagy's unlawful actions, Mr. Culbreath was trampled and suffered additional physical injury.

Outside the cafeteria, Mr. Culbreath repeatedly pleaded with Defendant Lt. Tokarz for decontamination and medical attention for the chemicals still upon him. When Defendant Tokarz eventually granted Mr. Culbreath some measure of unreasonably-delayed decontamination, it was meager and unreasonably insufficient—Mr. Culbreath was given about one minute at a single showerhead with other inmates. In that short time and under those circumstances, Mr. Culbreath tried to reach and make use of as much water as he could. Then, Mr. Culbreath was taken and locked in his cell still with chemicals on him and suffering their injurious effects.

I now return to Mr. Culbreath's need for Dr. Borak and the instant application. As the Court will recall, Plaintiff previously made pro se motions for discovery relating to the chemicals used upon him during the incident. The Court denied those motions with leave to renew upon Plaintiff's retention of a toxicology expert whose testimony could meaningfully help the Court, the Parties and a jury understand that information, i.e., through testimony about the nature of the chemicals used in the force incident (discovery suggests that chemicals of varying potencies were deployed), their commonly-understood effects on various human bodily system (which is why law enforcement uses them as a force-control tool), whether and to what extent timely and/or adequate decontamination mitigates the human harms inflicted upon those exposed to these particular chemicals; and more (hereinafter collectively "chemical discovery").[2] Dr. Borak will be Plaintiff's expert.

Although I cannot make a precise estimate of Dr. Borak's fees for effective performance of his work because I do not yet have the full chemical discovery he needs (the volume of which will dictate how many hours he needs to go through it), I represent to the Court that I reasonably believe I can limit the expense to no more than $11,000. This figure includes Dr. Borak's preparation of his report and his eventual trial testimony. After adding this $11,000 for Dr. Borak to the higher-number in my deposition cost-range estimate, I make this fund-preauthorization application for the $14,000 total sum.[3]

As required by the Standing Order, I believe that the necessary "extraordinary circumstances" exist to obtain preauthorization for funds in excess of $10,000 for the following reasons. See Exh. 1 ¶ 2.

Dr. Borak's expert testimony is critical to the central issues in Mr. Culbreath's case because, without it, Mr. Culbreath will be hamstrung in presenting his clearest evidence to a jury regarding the unreasonableness of Defendants' contested actions. For example, and as the Court's earlier chemical-discovery-motion denials suggest, a lay witness would not be able to reliably/helpfully explain the

---

[2] I note that I have served Defendants with a FRCP 26 expert notice for Dr. Borak, and will renew Mr. Culbreath's discovery requests relating to the chemicals so that Dr. Borak may have the necessary data for his work. As with much else referenced in this application, I will be prepared to answer the Court's questions regarding Dr. Borak's qualifications and the referenced discovery at the Parties' October 19, 2018, conference.

[3] I would like to stress what is obvious—my final total costs will not exceed $10,000 if the lower end of my cost-range estimates are realized. I will make every reasonable effort to achieve that result, but I must acknowledge in this application that, particularly with respect to Dr. Borak, I cannot control final costs with certainty.

I also note that in the event Dr. Borak's fee exceeds this amount (which is the maximum that I account for in this preauthorization application, I further represent to the Court that I am willing to pay the difference from my own pocket. This is how strongly I feel about his testimony's importance to Mr. Culbreath's case.

chemical discovery. Relatedly, and importantly, a lay jury cannot understand it without expert exposition. Without Dr. Borak's contribution, what would be left is Mr. Culbreath's testimony about injury and pain caused by the challenged chemical force and surrounding events, and Defendants' arguments that Mr. Culbreath has no objective proof showing that such chemicals' effects can or are meant to inflict injury and pain to such a degree or for such duration.

The need for Dr. Borak's testimony is further supported by law and discovery demonstrating institutional acknowledgement that the use of chemical force requires cautious regulation. See, e.g., 9 NYCRR §§ 7634.1-7634.7 (state law regulating chemical uses of force). Although I will refrain from discussing confidential discovery on this point, I will be ready to answer the Court's related questions while arguing broadly here that one can reasonably infer that careful regulation of chemical force shows institutional and social concern for the human harms threatened by exposure, which in turn bears on the reasonableness of challenged actions in this case.

Also, Plaintiff must address potential jury confusion regarding the nature, potency and effects of the law-enforcement-grade chemical agents at issue here as compared with those same facts as they pertain to what I will call "civilian personal-defense devices" such as those sold on keychains. From my own personal (and admittedly non-expert) reading, I believe that chemical agents such as the ones at issue in this case are different in constitution, strength and effect from weaker and/or smaller civilian personal-defense devices with which a jury is much more likely to be familiar.[4]

Finally, I note that there is at least one other § 1983 case in this District arising from the same chemical UOF incident. It is my understanding that the pro se plaintiff in that case obtained counsel after discovery closed, with no pro bono funds expended for discovery. See Burns v. Nagy, No. 16 Civ. 782 (VB). Although I do not know all Parties' or the Court's view on eventual consolidation of these related cases, I note only that Plaintiff's application here could at least conceivably redound to the benefit of both in forma pauperis litigants at some point, and not just Mr. Culbreath alone.

In light of the foregoing, I respectfully ask that both Your Honor and Chief Judge McMahon preauthorize up to $14,000 in reimburseable funds to properly litigate this case. This will permit me to retain Dr. Borak, and I again state that I will make every reasonable effort to not require the full requested amount which is based on range estimates.

Sincerely,

Ryan Lozar

---

[4] I do not expect the Court to credit my lay understanding of this from my own reading for all the reasons I argue that Dr. Borak's testimony in this case is sufficiently important to show "exceptional circumstances" under the Standing Order.